UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>DMCA Subpoena to Cloudflare, Inc. | No. 25-MC-555 (KMK)<br><br>OPINION & ORDER |

Appearances:

Melanie N. Baptiste-Jean Noel, Esq.
MBJN Law
Lawrenceville, GA
*Counsel for Petitioner*

Karen O. Stewart, Esq.
Miller McNamara & Taylor LLP
Brewster, NY
*Counsel for Petitioner*

Mitchell L. Stoltz, Esq.
Elizabeth D. Femia, Esq.
Electronic Frontier Foundation
San Francisco, CA
*Counsel for J. Doe*

Jonathan L.A. Phillips
Brown, Hay & Stephens, LLP
Peoria, IL
*Counsel for J. Doe*

KENNETH M. KARAS, United States District Judge:

Watch Tower Bible and Tract Society of Pennsylvania ("Watch Tower" or "Petitioner") requested a subpoena pursuant to the Digital Millennium Copyright Act ("DMCA"), seeking information from Cloudflare, Inc. ("Cloudflare") as to the identity of J. Doe ("Doe"), who Petitioner claims posted Petitioner's copyrighted material on a website secured by Cloudflare. (*See* Proposed Order (Dkt. No. 5).) Before the Court is Doe's motion to quash the subpoena (the "Motion"). (*See* Mot. to Quash Subpoena to Cloudflare (Dkt. No. 28).) Because Doe has not

shown that any First Amendment-protected interest in anonymity requires the Court to quash the subpoena, the Court denies the Motion.

## I. Background

### A. Factual Background

The following facts are drawn from the Parties' Declarations. *See Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 119–20 (2d Cir. 2010) (considering the parties' declarations on a motion to quash a DMCA subpoena); *In re Grand Jury Subpoena Duces Tecum Dated May 9, 1990*, 741 F. Supp. 1059 (S.D.N.Y. 1990) ("consider[ing] . . . evidence" in resolving motion to quash).

Doe is a foreign citizen who was "raised as a Jehovah's Witness" and has "been a member of that community [their][1] whole life." (Decl. of J. Doe in Supp. re: Mot. to Quash Subpoena to Cloudflare ("Doe Decl.") ¶¶ 2, 13 (Dkt. No. 30).) "Most of [Doe's] friends, family members, and coworkers today are Jehovah's Witnesses," and Doe "still consid[ers] [themself] a Jehovah's Witness." (*Id.* ¶ 2.) But Doe purports to have "questions, doubts[,] and concerns" about "aspects of the community's teachings and practices," and claims to be uneasy about the consequences of sharing those concerns openly, which could include being "labe[l]ed [an] 'apostate[]' and be[ing] excommunicated or 'disfellowshipped' from the community." (*Id.*) As relevant here, Doe's concern is that "the Jehovah's Witnesses organization . . . has altered the historical record of its own publications," but does "not provide access to many of their own historical publications," resulting in an "incomplete and unreliable official record" of the organization's teachings and positions. (*Id.* ¶¶ 3–4; *see also id.* ¶ 6 (noting, as examples, the

---

[1] Because the Parties do not identify Doe's gender, the Court refers to Doe using gender-neutral pronouns.

organization's past predictions as to when the world will end, and the organization's increases in "requests for donations and calls for obedience").)

To "understand how Jehovah's Witnesses' teachings have changed over time" and to "provide [Doe's] community with objective and unbiased information" about those teachings, Doe "created an archive of publications by Watch Tower" that Doe made text-searchable using Optical Character Recognition ("OCR"); Doe also created "text- and data-mining software tools to analyze the frequency of use of particular words, phrases, and citations to Bible verses over time" in those publications. (*Id.* ¶¶ 4–7.)

Watch Tower, "a nonprofit corporation organized to create, publish, and distribute intellectual property that supports the global bible education work of Jehovah's Witnesses," owns the copyright to some of the material in that archive, including the "July/August 2022 edition of the *Awake!* Magazine." (*See* Decl. of Melanie Baptiste-Jean Noel in Opp'n re: Mot. to Quash Subpoena to Cloudflare ("Noel Decl.") ¶¶ 16, 5–6 (Dkt. No. 34).) Watch Tower itself does not "make ecclesiastical decisions" or "remove individuals from their local congregation of Jehovah's Witnesses." (*Id.* ¶ 17.) Watch Tower also operates its own archive of publications, which "includes an index of changes in the beliefs of Jehovah's Witnesses" from 1870 through to present. (*Id.* ¶ 19.)

Doe made both the archive and the aforementioned tools "available anonymously on the internet" by putting them on a website and sharing links to them on Reddit, where Doe posts under the username u/ComingOutaMyCage. (Doe Decl. ¶ 7; Noel Decl. ¶¶ 15, 20.) Doe represents that they are not seeking and have never sought to earn money from running their website. (Doe Decl. ¶ 11.) Doe has since taken down the archive, (*id.* ¶ 17), but the analytical tools remain accessible and usable on the website, (Noel Decl. ¶ 4). Considering Doe's interest

in anonymity, Doe used Cloudflare for "reverse proxy services for the website," which "protect against disclosure of [Doe's] identity as the owner" and "protect the website against denial-of-service attacks." (Doe Decl. ¶ 8.) Doe is concerned that, if the Court denies the Motion, Doe's "speech activities and specifically, [their] dissemination" of "truthful information regarding Jehovah's Witnesses doctrine" would be "chilled" because Doe would be subjected to "social exclusion" from a community Doe has "been part of . . . [their] whole life." (*Id.* ¶ 17; *see also id.* ¶ 12.)

B.  Procedural Background

On December 4, 2025, Petitioner moved for a subpoena to Cloudflare for information as to Doe's identity, pursuant to 17 U.S.C. § 512(h), claiming Doe's website published Watch Tower's copyrighted information. (*See* Proposed Order.) The Court so-ordered the subpoena on December 8, 2025. (*See* Order Granting Subpoena (Dkt. No. 6).) On January 21, 2026, Petitioner moved for an order to show cause why Cloudflare, which had not yet complied with the subpoena, should not be held in contempt. (*See* First Mot. for O.S.C. (Dkt. No. 8).) Doe appeared through counsel the same day and sought a pre-motion conference on the Motion to Quash, (*see* Notice of Appearance (Dkt. No. 12)), and on February 2, 2026, Cloudflare appeared through counsel and opposed Petitioner's contempt motion, (*see* Mem. in Opp'n re: First Mot. for O.S.C. (Dkt. No. 20)). The Court denied the contempt motion and granted Doe leave to move to quash at a hearing on February 23, 2026. (*See* Dkt. (minute entry dated Feb. 23, 2026).) Doe filed the Motion on March 9, 2026. (*See* Mot. to Quash Subpoena to Cloudflare; Mem. in Supp. re: Mot. to Quash Subpoena to Cloudflare ("Doe's Mem.") (Dkt. No. 29).) Petitioner opposed the Motion on March 23, 2026. (*See* Mem. in Opp'n to Mot. to Quash Subpoena to

4

Cloudflare ("Pet'r's Mem.") (Dkt. No. 33).)  Doe replied on March 30, 2026.  (*See* Reply Mem. in Supp. re: Mot. to Quash Subpoena ("Reply") (Dkt. No. 36).)

## II.  Discussion

### A.  Standard of Review

"On timely motion, the court for the district where compliance is required must quash or modify a subpoena that[] . . . requires disclosure of privileged or other protected matter . . . [or] subjects a person to undue burden."  Fed. R. Civ. P. 45(d)(3)(A).[2]  "The determination of whether a subpoena subjects a witness to undue burden is committed to the sound discretion of the trial court."  *Fecteau v. City of Mount Vernon*, No. 23-CV-9173, 2025 WL 2391410, at *1 (S.D.N.Y. Aug. 15, 2025) (citing *In re Blackstone Partners, L.P.*, No. 04-CV-7757, 2005 WL 1560505, at *2 (S.D.N.Y. July 1, 2005)).  The movant bears the burden of showing "good cause" for the motion to quash.  *Dove v. Atl. Cap. Corp.*, 963 F.2d 15, 19 (2d Cir. 1992) (quoting *Penthouse Int'l, Ltd. v. Playboy Enters.*, 663 F.2d 371, 391 (2d Cir. 1981)); *see also Strike 3 Holdings, LLC v. Doe*, 337 F. Supp. 3d 246, 251 (W.D.N.Y. 2018) ("[T]he burden of persuasion in a motion to quash a subpoena . . . is borne by the movant." (quoting *Sea Tow Int'l, Inc. v.*

---

[2] Rule 45(d) governs motions to quash a DMCA subpoena.  The statute provides that "the procedure for issuance and delivery of the subpoena, and the remedies for noncompliance with the subpoena, shall be governed to the greatest extent practicable by those provisions of the Federal Rules of Civil Procedure governing the issuance, service, and enforcement of a subpoena duces tecum," and Rule 45 is a provision governing the issuance, service, and enforcement of subpoenas.  17 U.S.C. § 512(h)(6); *see also In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 877 (N.D. Cal. 2022) (explaining that this provision "incorporates Federal Rule 45," including as to motions to quash); *In re DMCA Subpoena to GoDaddy.com, LLC*, No. 25-MC-319, 2025 WL 3551922, at *1 (D. Md. Dec. 11, 2025) (substantially same).  Accordingly, Doe's arguments about any alleged First Amendment interests are best understood through this prism—that is, that the First Amendment creates a qualified privilege that Petitioner's subpoena must overcome if that privilege applies here.  *See Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010) ("To the extent that anonymity is protected by the First Amendment, a court should quash or modify a subpoena designed to breach anonymity.").

*Pontin*, 246 F.R.D. 421, 424 (E.D.N.Y. 2007)). Further, the movant "must have standing," *i.e.*, must be "seeking to protect a personal privilege or right" in moving to quash the subpoena. *Strike 3 Holdings, LLC*, 337 F. Supp. 3d at 251 (citing *Nova Prods., Inc. v. Kisma Video, Inc.*, 220 F.R.D. 238, 241 (S.D.N.Y. 2004)).

B. Analysis

The core of Doe's argument is that allowing the subpoena to issue would compromise Doe's First Amendment-protected right to speak anonymously. (*See* Doe's Mem. 7.)

The First Amendment, including the right to speak anonymously that it protects, can provide the basis for quashing a subpoena. "To the extent that anonymity is protected by the First Amendment, a court should quash or modify a subpoena designed to breach anonymity." *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010) (citing Fed. R. Civ. P. 45(d)(3)(A)). Doe has standing to challenge the subpoena on this basis. *See, e.g.*, *Malibu Media, LLC v. Doe*, No. 15-CV-3147, 2016 WL 5478433, at *2 (S.D.N.Y. Sept. 29, 2016) ("The Second Circuit has recognized that an individual may challenge a subpoena directed at his ISP in order to preserve his anonymity.").[3]

---

[3] The Court is not persuaded that Doe waived their interest in anonymity by accepting Cloudflare's terms of service, which allow Cloudflare to "disclose personal information to respond to subpoenas, court orders, or legal process," including for copyright infringement, "[w]hen [Cloudflare] [is] required to disclose" that information. (Pet'r's Mem. 20.) That is for a simple reason: Cloudflare has not yet been "required to disclose" that information because the Court held the subpoena in abeyance pending resolution of the motion to quash. (*See* Dkt. (minute entry dated Feb. 23, 2026).) The Court accordingly need not reach Doe's other arguments as to waiver, because Doe clearly has not waived that interest for the purposes of this Motion. (*See* Reply 9–10.)

The Second Circuit has held that an "appropriate general standard for determining whether a motion to quash [a subpoena], to preserve the objecting party's anonymity, should be granted" involves considering five factors:

> (1) the concreteness of the plaintiff's showing of a prima facie claim of actionable harm, (2) the specificity of the discovery request, (3) the absence of alternative means to obtain the subpoenaed information, (4) the need for the subpoenaed information to advance the claim, and (5) the objecting party's expectation of privacy.

*Arista Recs., LLC*, 604 F.3d at 119 (quoting in part *Sony Music Ent. Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 564–65 (S.D.N.Y. 2004)) (alterations adopted). Courts have applied this test to motions to quash DMCA subpoenas that seek to reveal a purported copyright infringer's identity. *See, e.g.*, *In re DMCA Section 512(h) Subpoena to YouTube (Google, Inc.)*, 581 F. Supp. 3d 509, 515 (S.D.N.Y. 2022) (applying this test to such a motion); *Strike 3 Holdings, LLC*, 337 F. Supp. 3d at 251 (same); *Signature Mgmt. Team, LLC v. Automattic, Inc.*, 941 F. Supp. 2d 1145, 1154–55 (N.D. Cal. 2013) (same).[4] Because the first four factors support Petitioner and the fifth is close, the Court denies the Motion. The Court addresses each factor in turn.

---

[4] Petitioner argues this test "is not appropriately suited to" a DMCA subpoena, which is issued before litigation commences, in contrast with a motion to quash a subpoena in an ongoing case, as occurred in *Arista*. (Pet'r's Mem. 5.) But Petitioner does not explain why this distinction would mean *Arista* is not controlling in this case. As explained *supra* note 2, the same Federal Rules of Civil Procedure govern a DMCA subpoena as governed the requested subpoena in *Arista*, which also sought to unmask an alleged copyright infringer, and the *Arista* court's language was clear that Rule 45 and the *Arista* factors made up an appropriate framework for motions to quash subpoenas premised on "the First Amendment . . . qualified right to use the Internet anonymously." *Arista Recs., LLC.*, 604 F.3d at 113–14; *see In re DMCA Section 512(h) Subpoena to YouTube (Google, Inc.)*, 581 F. Supp. 3d at 515 (applying *Arista* to a DMCA subpoena). So under the Second Circuit's binding precedent and the text of the DMCA itself, which incorporates the Federal Rules of Civil Procedure, there is no reason to think applying *Arista* or Rule 45 would "override[] the procedural structure Congress created in the DMCA," as Petitioner claims. (Pet'r's Mem. 6.)

## 1. Concreteness of the Showing of Prima Facie Harm

A prima facie case of copyright infringement requires that a "plaintiff must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Warner Bros. Ent. Inc. v. RDR Books*, 575 F. Supp. 2d 513, 533 (S.D.N.Y. 2008) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

Petitioner has demonstrated both elements. First, Petitioner has established—and Doe does not contest—Petitioner's "ownership of a valid copyright," at least in the *Awake!* edition discussed in Petitioner's briefing and declaration. (*See* Noel Decl. ¶ 6; *id.* Ex. B (attaching the registration for the copyright).) Second, Petitioner has shown—and again, Doe does not contest—that Doe has "cop[ied] constituent elements of the work." (*See id.* ¶ 6–7.) That suffices to state a prima facie claim of copyright infringement. *See Strike 3 Holdings, LLC v. Doe*, No. 19-CV-02614, 2019 WL 1837447, at *2 (S.D.N.Y. Apr. 10, 2019) (finding prima facie claim of copyright infringement had been established for purposes of the *Arista* test where the plaintiff "set[] out the copyrighted works at issue and provide[d] comprehensive allegations regarding the manner by which the [d]efendant copied the various works"); *UN4 Productions, Inc. v. Doe—173.68.177.95*, No. 17-CV-3278, 2017 WL 2589328, at *2 (S.D.N.Y. June 14, 2017) (finding a prima facie claim of infringement had adequately been alleged where the "plaintiff ha[d] established registration and ownership of a valid copyright in a work" and alleged "copying . . . without its authorization"); *Sony*, 326 F. Supp. 2d at 565 (finding a "concrete showing of a prima facie claim of copyright infringement" where these two elements of a prima facie claim were alleged). Doe *does* contest whether Doe's copying was fair use, which the Court will address *infra*, but as fair use is a response to a prima facie case of copyright

8

infringement, rather than an element that must be established as part of that prima facie case, it is not relevant to this factor.[5]

The first factor accordingly tips in Petitioner's favor.

2. Specificity of the Discovery Request

The second factor, the specificity of the discovery request, favors Petitioner. In *Sony Music*, from which the *Arista* court drew its five-factor test, the court found the second factor favored the copyright owner when the information the owner sought, "identifying information about particular Cablevision subscribers," would "enable plaintiffs to serve process on defendants." 326 F. Supp. 2d at 566. So too here: Petitioner seeks "identifying information, including subscriber registration information, the name(s), address(es), telephone number(s), any electronic mail addresses," and IP addresses, associated with Doe's website. (1st Noel Decl. Ex. A, at 1 (Dkt. No. 1).) That information is necessary to make service of a suit for infringement possible, "so the narrowness of this request weighs in favor of" Petitioner. *Strike 3 Holdings, LLC v. Doe*, No. 26-CV-417, 2026 WL 1068051, at *3 (D. Conn. Apr. 20, 2026) (finding second

---

[5] The parties extensively discuss fair use under this factor. While some district courts have also discussed fair use under this factor, *see, e.g.*, *In re DMCA Section 512(h) Subpoena to YouTube (Google, Inc.)*, 581 F. Supp. 3d 509, 517–18 (S.D.N.Y. 2022); *In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875, 883 (N.D. Cal. 2020), this Court considers fair use to be more doctrinally comfortable under the expectation of privacy factor because, as discussed *infra*, it bears on whether the secondary use is protected speech that can be made anonymously. Fair use, or the absence of fair use, is not an element of a prima facie case of copyright infringement—it is a defense that is a *response* to a prima facie case. *See, e.g.*, H.R. Rep. No. 102-836, at 3 (1992) ("Fair use . . . is relevant only after a copyright owner has made out a prima facie case of infringement."); *Lynk Media, LLC v. Indep. Digital News & Media, LLC*, No. 24-CV-583, 2025 WL 2771625, at *9 (S.D.N.Y. Sept. 29, 2025) ("The [c]ourt first considers whether [the p]laintiff has established a *prima facie* case of copyright infringement before turning to the defense[] of . . . fair use."); William F. Patry, Patry on Fair Use § 6:2 (May 2026) ("[F]air use is an affirmative defense[.]"). Indeed, the *Arista* court's brief discussion of fair use—affirming that fair use is an appropriate consideration at this stage—was not part of the court's discussion of a prima facie case. *See Arista Recs., LLC*, 604 F.3d at 123–24.

*Arista* factor supported copyright holder where holder sought name and address associated with ISP subscriber's IP address); *Malibu Media, LLC v. Doe No. 4*, No. 12-CV-2950, 2012 WL 5987854, at *3 (S.D.N.Y. Nov. 30, 2012) ("Malibu's subpoena request is highly specific in nature; it seeks the name, current and permanent address, e-mail address, and Media Access Control (MAC) Address of each Doe defendant, attempting to obtain enough information to identify and serve the defendants."). Doe's only responses go to the merits—Doe argues the information is not necessary to advance a claim because Doe's archive was a fair use, and in any event, Doe has taken the archive down. (Doe's Mem. 15.) But Doe does not explain why the merits are a relevant concern for this factor, which the *Sony* court explained focuses only on the "reasonable likelihood that the discovery request would lead to identifying information that would make possible service upon particular defendants who could be sued in federal court," not certainty that the copyright holder would ultimately prevail on the merits. *Sony*, 326 F. Supp. 2d at 566. In any event, the Court addresses the Parties' fair use arguments *infra*. And "lack of ongoing infringement would not prevent liability if prior infringement is established," so Doe's takedown of the archive would not be a complete defense to liability, though it might limit damages Petitioner could claim. *Patagonia, Inc. v. Slumped Boyz LLC*, No. 25-CV-707, 2025 WL 3711853, at *3 (C.D. Cal. Nov. 14, 2025).

### 3. Absence of Alternative Means

The third factor "asks whether the plaintiff has any other available means for obtaining the information sought." *UN4 Productions, Inc.*, 2017 WL 2589328, at *3. Petitioner's counsel attested that Petitioner "has no alternative means" to identify the website operator, and the "lack of alternatives is compounded by Cloudflare's refusal to disclose even the identity of the website's hosting provider." (Noel Decl. ¶ 13.) Petitioner also provided an unrebutted

10

declaration from an "information technology and network security professional" attesting that he was not able to obtain contact information for Doe or identify the IP address associated with Doe's use of the website "through independent investigation, monitoring, or other public sources," so "[o]ther than obtaining the information from a service provider used by the website, [Petitioner] has no . . . reasonable alternative means to obtain" the information it seeks.  (Cares Decl. ¶¶ 1–6 (Dkt. No. 35).)  That suffices to weigh this factor in Petitioner's favor.  *See UN4 Productions, Inc.*, 2017 WL 2589328, at *3 (finding this factor supported the copyright holder upon a substantially similar showing); *contra Malibu Media, LLC*, 2015 WL 1780965, at *2 (finding this factor supported the secondary user when the copyright holder offered only a "conclusory, unsupported contention that no alternative means exist to obtain the defendant's identity except by serving a subpoena on the defendant's ISP").

    4. Need for Information to Advance the Claim

The information sought here, because it would tend to identify Doe, is necessary to advance the claim.  "Disclosure of the identifying information to [Petitioner's] counsel is a necessary prerequisite to the litigation being advanced—this was part of the Court's reasoning for allowing the subpoena." *Strike 3 Holdings, LLC*, 337 F. Supp. 3d at 258; *see also UN4 Productions, Inc.*, 2017 WL 2589328, at *3 ("[The p]laintiff reasonably argues that it cannot litigate its claims without ascertaining the identity and address of each Doe defendant . . . . As several courts have noted, the information [the plaintiff] seeks is essential to allowing it to pursue its legal rights." (collecting cases) (citation omitted)).  This factor accordingly also weighs in Petitioner's favor.

#### 5. Objecting Party's Expectation of Privacy

Petitioner's and Doe's privacy arguments, fair use arguments, and First Amendment arguments are coextensive here. Doe's interest in anonymity here is protected by the First Amendment to the extent the speech Doe seeks to make anonymously is protected. *See Cornelio v. Connecticut*, 32 F.4th 160, 169–70 (2d Cir. 2022) (explaining that the "decision to remain anonymous" in one's expression "is an aspect of the freedom of speech protected by the First Amendment" (quotation marks and citation omitted, alteration adopted)). And as relevant here, Doe's copying of Petitioner's works on Doe's website is protected speech only if it makes a fair use of those works. *See Sarl Louis Feraud Int'l v. Viewfinder, Inc.*, 489 F.3d 474, 482 (2d Cir. 2007) ("With regard to the protections provided by the First Amendment for the unauthorized use of copyrighted material, [the Second Circuit] has held that absent extraordinary circumstances, 'the fair use doctrine encompasses all claims of First Amendment in the copyright field.'" (quoting *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1378 (2d Cir. 1993)); *Arista Recs., LLC*, 604 F.3d at 118 ("The First Amendment does not . . . provide a license for copyright infringement."). The arguments are coextensive because, "to the extent that anonymity is used to mask copyright infringement or to facilitate such infringement by other persons, it is unprotected by the First Amendment." *Arista Recs., LLC*, 604 F.3d at 118. Accordingly, Doe's expectation of privacy, and this *Arista* factor, turns on whether Doe's use is fair or infringing.[6]

---

[6] While Petitioner does not rebut Doe's claims that the consequences of shunning or "disfellowshipping" can be serious, Doe does not point the Court to any authority for considering those consequences as part of the inquiry as to whether the subpoena should be quashed. *See In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d at 887 ("Watch Tower is perfectly free to organize its internal disciplinary practices as it sees fit, without interference from the courts. . . .

"[T]he fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . ., scholarship, or research, is not an infringement of copyright."  17 U.S.C. § 107.  Courts must consider four factors "[i]n determining whether the use made of a work in any particular case is a fair use," which are:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id.*; *see also Campbell*, 510 U.S. at 578 ("All [four factors] are to be explored, and the results weighed together, in light of the purposes of copyright.").  Other courts have treated a strong fair use argument that can be resolved at this stage as decisive in quashing a DMCA subpoena.  *See, e.g.*, *In re DMCA Section 512(h) Subpoena to YouTube (Google, Inc.)*, 581 F. Supp. 3d at 518 ("[I]f the fair use inquiry demonstrates that [Doe] is not an infringer of Watch Tower's copyrighted works, then the subpoena must be quashed." (quoting *In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d at 883) (alteration adopted)); *In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 881 (N.D. Cal. 2022) (quashing a DMCA subpoena after finding fair use).  Nevertheless, while it can be appropriate to consider fair use at the early stages of a case, the Second Circuit has cautioned that "[b]ecause the determination of fair use is an open-ended and context-sensitive inquiry, courts most frequently address a proffered fair use defense at summary judgment."  *Richardson v. Townsquare Media*, 174 F.4th 299, 306 (2d Cir. 2026) (quotation marks and citations omitted, alteration adopted); *see also Cariou v. Prince*, 714

---

As this order makes clear, those considerations play no role whatsoever in the fair use analysis, and the Court has not relied on them for any of the findings here.").

13

F.3d 694, 704–05 (2d Cir. 2013) (describing fair use as a "mixed question of fact and law" demanding an "open-ended and context-sensitive inquiry").

With the first and third factors clearly favoring Petitioner, the second factor only somewhat favoring Doe, and the fourth factor favoring Doe, the Court cannot find at this stage that Doe's archive constitutes a fair use of Petitioner's works.

### a. Purpose and Character of Use

The Court starts with the first factor, the purpose and character of the use. "In assessing the first factor, courts consider two sub-factors: (i) the extent to which the secondary use is transformative and (ii) whether the secondary use is commercial in nature." *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 179 (2d Cir. 2024) (citing *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 37 (2d Cir. 2021)). "Though [the Court must] consider both transformativeness and commerciality, transformativeness is the 'central' question." *Id.* (quoting *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023)).

Doe's websites make two uses of Petitioner's work—the archive and the analytical tools. Doe represents that neither use is commercial because Doe "never made any money in connection with the archive and tools" and never "sought to do so." (Doe Decl. ¶ 11.) Petitioner responds that "[w]ithout Doe's identity and an opportunity for discovery," however, "it is impossible to truly discern the full extent and nature of Doe's use of Watch Tower's works." (Pet'r's Mem. 11.) Doe replies that that this is "only speculat[ion]." (Reply 5.) From Doe's Declaration and Petitioner's exhibits, however, there is no indication that Doe monetizes the archive or could. Petitioner's screenshots of the archive include no advertisements or paywalls, for example. *See Iwamura v. Indep. Digital News & Media, LLC*, No. 23-CV-9557, 2026 WL

14

83896, at *3 (S.D.N.Y. Jan. 12, 2026) (treating a use as commercial where a work was allegedly reposted on a news website "monetized through paid subscriptions and advertisements").  Nor are they designed to entice the purchase of some other good or service from Doe.  *See Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 22 (1st Cir. 2000) (affirming a district court's determination that a use was commercial where works were used "to create an enticing lead page that would prompt readers to purchase [a] newspaper").  And Doe's Reddit posts, which Petitioner also includes as exhibits, are consistent with Doe's website being noncommercial and with Doe's Declaration.  (*See, e.g.*, Noel Decl. Ex. E, at 3 (offering other Reddit users offline HTMLs and backup data from the website).)  Accordingly, because "[t]he crux of the" commerciality inquiry is "whether the user stands to profit from exploitation of the copyrighted material without paying the customary price" and the Court does not see on this record how Doe "stands to profit," it finds the uses are noncommercial.  *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985); *see also Wilder v. Hoiland*, No. 24-1436, 2025 WL 783642, at *2 (2d Cir. Mar. 12, 2025) (summary order) (same).

But the two uses vary in their transformativeness.  *Authors Guild v. Google*, with facts not dissimilar to those in this case, provides a helpful grounding.  Beginning in the early 2000s, Google "scanned, rendered machine-readable, and indexed more than 20 million books, including . . . copyrighted works" to create its Google Books service.  *Authors Guild v. Google*, 804 F.3d 202, 208 (2d Cir. 2015).  That scanning enabled the creation of a "search engine" allowing users to find books with their search terms and retrieve information about those books (including a "snippet" of the pages where the text appeared), and allowed Google to run big-data analysis such as "furnish[ing] statistical information to Internet users about the frequency of word and phrase usage over centuries."  *Id.* at 209 (footnote omitted).  Google also made the

machine-readable copies and digital images of these books available to libraries pursuant to "agreements between Google and the libraries" that "require the libraries to abide by copyright law in utilizing the digital copies they download." *Id.* at 210. The Second Circuit had "no difficulty concluding" that the search engine and analytics features of Google Books "involve[d] a highly transformative purpose." *Id.* at 216. And the provision of the works to libraries did not concern the court because the libraries "propose[d] to use their digital copies to enable the very kinds of searches that [the court] here h[e]ld to be fair uses in connection with Google's offer of such searches to the Internet public," and Google's agreements with each library "commit[ted] the library to use its digital copy only in a manner consistent with the copyright law, and to take precautions to prevent dissemination of their digital copies to the public at large." *Id.* at 228–29.

For the same reasons, the analytic tools here are plainly transformative. *See Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97 (2d Cir. 2014) (holding "the creation of a full-text searchable database is a quintessentially transformative use" because, among other things, "the result of a word search is different in purpose, character, expression, meaning, and message from the page (and the book) from which it is drawn"); *see also Fox News Network, LLC v. TVEyes, Inc.*, 43 F. Supp. 3d 379, 393 (S.D.N.Y. 2014) ("[D]atabases that convert copyrighted works into a research tool to further learning are transformative."). Petitioner thus rightly does not focus its briefing on the analytics features. (*See* Pet'r's Mem. 12.)

The archive, on the other hand, is not transformative on this record. Had Doe's archive resembled that of Google Books—for example, if Doe's archive were not publicly available in its entirety online and displayed only "snippets," or if it were accessible to others only with the sorts of restrictions found permissible in *Google*—it would be less appropriate to call it a "mere[] repackag[ing] or republish[ing] [of] the original." Pierre N. Leval, *Toward a Fair Use Standard*,

16

103 Harv. L. Rev. 1105, 1111 (1990); *see also HathiTrust*, 755 F.3d at 97 ("Importantly, . . . the [search tool] does not allow users to view any portion of the books they are searching. Consequently, in providing this service, the [search tool] does not add into circulation any new, human-readable copies of any books."). But the source material Doe used for the analytics tools was available on Doe's website in its entirety for all to read, regardless of their intentions for the work. (*See* Noel Decl. ¶ 6 ("Doe, without Watch Tower's consent, unlawfully copied, reproduced, publicly displayed, and distributed Watch Tower's *Awake!* issue on Doe's JWS Library site in its entirety and without alteration, for further reproduction via download, without restriction."); *id.* Ex. B, at 7–32 (showing the copied work); *id.* Ex. C, at 2–29 (same)). Doe did effect some transformation by digitizing and centralizing the works, and making them text-searchable. But there is little daylight between that transformation and the Internet Archive's Free Digital Library, which allowed users to borrow free digital copies of copyrighted works. The Second Circuit has held that the Free Digital Library was not fair use because it created "digital copies of the [copyrighted w]orks and distribute[d] those copies to its users in full, for free," and while there was "some 'change' involved in the conversion of print books to digital copies," that change was a "derivative use rather than a transformative one" as it was essentially no more than "[c]hanging the medium" of the work, a prototypically derivative use. *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 181 (2d Cir. 2024).

Doe further contends that the purpose and context of the archive are meaningfully different than the initial works. The Supreme Court has stressed that "the first fair use factor . . . focuses on whether an allegedly infringing use has a further purpose or different character, which is a matter of degree." *Andy Warhol Found. for the Visual Arts*, 598 U.S. at 525. And whether the work is presented with a "new . . . message" is part of that inquiry. *Id.* at 541 (quoting

17

*Campbell*, 510 U.S. at 579); *see also Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 85 (2d Cir. 2014) ("[The defendant's] message—'This is what they said'—is a very different message from [the plaintiff's]—'This is what you should believe.'").  Doe has thoroughly explained that the intent in posting the archive is to enable analysis of Jehovah's Witnesses' teachings in a way that furthers questioning and criticism.  (*See* Doe Decl. ¶¶ 7–10.)

But unlike the tools, that message is not evident from the archive.  In *Swatch Group*, for example, the identity of the speaker (Bloomberg, a major financial news and data reporting service) was key; as the Second Circuit held, "where a financial research service obtains and disseminates important financial information . . . in order to make that information available to investors and analysts, that purpose lends support to a finding of fair use." *Swatch Grp. Mgmt. Servs. Ltd.*, 756 F.3d at 85; *see also Fox News Network, LLC v. TVEyes, Inc.*, 43 F. Supp. 3d 379, 393 (S.D.N.Y. 2014) (finding at summary judgment that a company's provision of a search engine that returned short clips of news organizations' copyrighted footage was fair use, noting the defendant's "evidence[] that its subscribers use the service for research, criticism, and comment is undisputed").  From Petitioner's exhibits, the archive pages did not seem to include or link to any criticism or discussion of the archive's purpose, nor would the pages' banner— "JWS Online Library, Historical Archive to preserve expressions of faith"—reflect any distinct message.  (*See, e.g.*, Noel Decl. Ex. A, at 3.)  And while Doe posted links to the archive in a social media community and context where Doe's message was clear, Doe also indicated the archive could be accessible through conventional search engines, meaning some viewers of the archive might not be aware that the materials were being presented with a transformative message or purpose at all.  (*See* Pet'r's Mem. 10 n.14.)  Finally, while the material in the archive is plainly necessary for Doe's non-infringing uses of the material, it does not follow that Doe's

18

publication of the entirety of that material online, separate and apart from Doe's transformative commentary, is also a transformative use—especially because Doe's analytic tools have continued functioning after the archive was taken down. (*See* Noel Decl. ¶ 4.)

Doe therefore has not shown on this record that, although the archive centralizes and digitizes Petitioner's works and enables others to perform certain research on them, the archive is a transformative use. *See Assoc. Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 552 (S.D.N.Y. 2013) (holding that "[t]he fact that [the defendant] also offer[ed] a number of analysis tools [did] not render its copying and redistribution of [copyrighted] article excerpts transformative"). And while Doe's use was noncommercial, "[e]ven absent commerciality, the clearly non-transformative nature of the use is sufficient to tip the first factor against a finding of fair use." *Monroe v. NorthStar Source Grp., LLC*, No. 23-CV-6220, 2025 WL 1939027, at *6 (S.D.N.Y. July 15, 2025).

Accordingly, the first factor tips in Petitioner's favor at this stage.

### b. Nature of the Copyrighted Work

The second factor, the "nature" of the copyrighted work, "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. The Court must "ask whether the copyrighted work is more 'expressive' or 'factual,' as fair use is more likely to be found where the work is 'factual or informational,'" and also "whether the copyrighted work has been previously published, because 'the scope of fair use involving unpublished works' is far more limited." *Richardson*, 174 F.4th at 308 (quoting *Andy Warhol Found.*, 11 F.4th at 45).

19

Petitioner's works in the archive, including the *Awake!* edition at issue, are published, and Petitioner does not dispute that they are. (*See* Doe's Mem. 13; Pet'r's Mem. 14–15.) Doe and Petitioner do dispute whether the *Awake!* magazine is factual. Doe describes it (along with other works) as "newsletters and other publications purporting to present factual information," (Doe's Mem. 12), while Petitioner describes it as including "highly expressive photographs, editorial design and articles interpreting bible texts for practical modern-day application," (Pet'r's Mem. 15). The attached *Awake!* edition includes both factual and expressive content— for example, the first chapter of it includes both ordinary physical and mental health advice, and interpretations of Bible verses and what relevant information they have to offer. (*See* Noel Decl. Ex. B, at 15–16.) The former, which simply relays commonsense information, appears factual; the latter, which expresses views on how religious texts relate to that information, is not. *See, e.g.*, *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 70 (2d Cir. 1999) (explaining that copyright "does not extend to facts," but does extend to "the manner of expression, the author's analysis or interpretation of events, the way he structures his materials and marshals facts, his choice of words, and the emphasis he gives" (citation omitted)).

Because the work at issue here is published and contains a mix of factual and expressive content, this factor—if it favors any side here—slightly favors Doe.

### c. Amount and Substantiality of Portion Used

The third factor, "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3), "asks whether the quantity and value of the materials used are reasonable in relation to the purpose of the copying," *Swatch Grp.*, 756 F.3d at 89 (citation and quotation marks omitted).

The purpose of Doe's copying, as explained *supra*, is their asserted interest in allowing critical research and analysis of Jehovah's Witnesses' teachings, and in particular, of how those teachings have changed over time. (*See* Doe's Mem. 13 ("Doe's resources are especially valuable specifically because they present a complete and uncensored history of the Jehovah's Witnesses' publications so that researchers can understand how the church's claims have changed over time and challenge the church's claims to divine insight.").) Doe contends that posting all of those works on Doe's website in their entirety is necessary to make that point. (*See id.* ("The underlying documents must also be made available without censorship if claims about their contents are to have any credibility.").)

But the archive's copying is not proportionate to Doe's goals. Doe does not dispute that the archive completely copies Petitioner's works. "Complete unchanged copying . . . [is typically] justified as fair use when the copying was reasonably appropriate to achieve the copier's transformative purpose and was done in such a manner that it did not offer a competing substitute for the original." *Authors Guild*, 804 F.3d at 221 (footnote omitted).[7] That purpose was met in *Authors Guild* because "[w]hile Google *makes* an unauthorized digital copy of the entire book, it *does not reveal that digital copy to the public*," and "[t]he copy is made to enable the search functions to reveal limited, important information about the books." *Id.* (second emphasis added). The court also found the snippets returned by Google Books searches could

---

[7] Because the Court finds that Doe's "use was not transformative, it follows that its use of the entire [copyrighted works] was not necessary" to a transformative use; this conclusion alone tilts the third factor in Petitioner's favor. *Source Digital, Inc. v. Michael Grecco Productions, Inc.*, No. 24-CV-2377, 2026 WL 878632, at *5 (S.D.N.Y. Mar. 31, 2026) (citing *Lynk Media, LLC v. Ind. Digit. News and Media, LLC*, No. 24-CV-583, 2025 WL 2771625, at *19 (S.D.N.Y. Sep. 29, 2025)).

not "usefully serve as a competing substitute for the original" considering limitations on the search results. *Id.* at 222. The trouble for Doe is that the archive does—also based on Doe's representations online—offer a competing substitute for the original and fully reveals the digital copies to the public without limitation. (Pet'r's Mem. 10 n.14.) Doe's critical goals could have been achieved with more tailored disclosure of the works. For example, the Second Circuit found the third factor favored the secondary user when the user included several quotes from copyrighted works by L. Ron Hubbard to criticize Scientology doctrine, because "the use of the quotes . . . [was] primarily a means for illustrating the alleged gap between the official version of Hubbard's life and accomplishments, and . . . the true facts. For that purpose, *some* conjuring up of the copyrighted work is necessary." *New Era Publ'ns Int'l, ApS v. Carol Pub. Grp.*, 904 F.2d 152, 159 (2d Cir. 1990). Here, Doe does not explain why the public disclosure of the full copyrighted work was necessary to retain credibility—Doe could have disclosed only parts of the works they directly compared or critiqued, or disclosed the full works only privately to Doe's critics rather than the Internet writ-large.[8] *See Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1030 (N.D. Cal. 2025) ("What matters is not so much the amount and substantiality of the portion used *in making a copy*, but rather the amount and substantiality of *what is thereby made accessible* to a public in the purported secondary use for which it may serve as a competing substitute for the primary use." (citation and quotation marks omitted, alteration adopted)).

---

[8] That should not be taken to say the Court finds these disclosures *would* tip the third factor in Doe's favor, or would automatically have made the archive a fair use. The point is only that more "necessary" and less "excessive" uses of the work are imaginable to achieve Doe's purposes. *HathiTrust*, 755 F.3d at 96, 98.

The third factor therefore tips in Petitioner's favor, because Doe's copying of the works in their entirety is broader than appropriate to achieve the critical goals Doe seeks to advance.

### d.  Effect of Use on Market

The fourth and final factor is "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  Doe argues "there is no market for licensing critical uses of the works at issue, and they have all been published free of cost for the public to read."  (Doe's Mem. 14.)  But Petitioner has attested that it does license copies of the materials included in the archive for research use, (*see* Noel Decl. ¶ 18), and accordingly, there could plausibly be "an impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets" for the works if researchers could turn to Doe's archive to copy those materials in their work instead of licensing them from Petitioner, *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006) (quotation marks omitted).[9]  That is not inconsistent with Petitioner publishing the works free of cost: Petitioner may make the works publicly and freely available to read, but not to copy.  *See Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1121 (D. Nev. 2006) (notwithstanding the plaintiff's "mak[ing] [his] works available to the public for free in their entirety," looking for "evidence that by displaying" the plaintiff's content, there was "any impact on any potential market for those works"); *Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 537 (5th Cir. 1994) ("If the [copyrighted work] is widely . . . reproduced, it is presumably with the permission of the copyright holder."); *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ("Although a television broadcast may be free to the viewer, this fact is equally irrelevant; a book borrowed from the public library may

---

[9] The argument that there is no market for licensing uses like Doe's because Doe's use is fair, (*see* Reply 8), is circular: that is, it presupposes fair use.

not be copied any more freely than a book that is purchased.") (Blackmun, J., dissenting). Moreover, Petitioner points to Doe's online comments that indicate the archive could, at least for some, supplant Petitioner's own websites and archives, by becoming available to Internet users writ-large through search results. (*See* Pet'r's Mem. 10 n.14.) That further nudges this factor in Petitioner's favor, because this factor is concerned with "use[s] that supplant[] any part of the normal market for a copyrighted work." *Harper & Row Publishers, Inc.*, 471 U.S. at 568 (citations and quotation marks omitted); *see also Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994) (recognizing that this factor looks to "only traditional, reasonable, or likely to be developed markets").

On the other hand, Doe points out that "Watch Tower does not allege that it charges money for licenses," (Reply 8), and Petitioner's submissions do not indicate that it has experienced or anticipates *economic* harm, (*see* Noel Decl.). So Petitioner has not shown a present, actual, or imminent impact to any licensing revenue. That puts Petitioner on shakier footing, because this fair use factor "requires [courts] to evaluate the *economic impact* of the allegedly infringing use on the copyright owner." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 481 (2d Cir. 2004) (emphasis added); *see also Blanch v. Koons*, 467 F.3d 244, 262 (2d Cir. 2006) (Katzmann, J., concurring) (explaining that "the fourth factor of the fair-use analysis dramatically favor[ed]" the defendant where the plaintiff "failed to show that [the defendant's] use of the work actually harmed her in any way," unlike another case where the plaintiff's "licensing of his work in general, and the appropriated work in particular, yielded considerable revenue"); *cf. Harper & Row Publishers, Inc.*, 471 U.S. at 558 (describing copyright law as supplying an "economic incentive to [both] create and disseminate ideas"). And if Petitioner has never sold or prospectively intends to sell a license for their works in general, much less for the

24

*Awake!* magazine here, it is hard to say Doe's use has resulted or might result in "economic injury to [the] copyright holder." *Hathitrust*, 755 F.3d 87 at 99.

Accordingly, on this record, the fourth factor tips somewhat in Doe's favor because although Doe's archive might have served as a substitute for Petitioner's works, Petitioner has not indicated what economic injuries that might cause them.

***

Four of the five *Arista* factors therefore favor Petitioner, and the fifth, a close call on this early record, does not strongly favor Doe. Petitioner has made a prima facie showing of copyright infringement; the information sought is sufficiently specific; Petitioner has shown an absence of alternative means to subpoenas to obtain that information; the information is necessary to advance the claim; and Doe's expectation of privacy hinges on whether their speech is protected, which in turn hinges on a fair use argument that Doe has not won at this early stage. With the *Arista* balancing largely favoring Petitioner, the Court denies Doe's Motion.

C.  Protective Order

The foregoing does not mean Doe's identity must be publicly revealed as soon as Cloudflare complies with the subpoena. Parties may generally not proceed anonymously in litigation. *See* Fed. R. Civ. P. 10(a). However, the Second Circuit has held that courts may allow parties to proceed anonymously by balancing one party's "interest in anonymity . . . against both the public interest in disclosure and any prejudice to the [other party]," considering, among other factors, "whether the litigation involves matters that are highly sensitive and of a personal nature," "whether the [party seeking anonymity] is particularly vulnerable to the possible harms of disclosure," whether the other party is "prejudiced by allowing the [party] to [proceed] anonymously," the public interest in the party's identity, and alternative means to

25

protect the party's privacy. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189–90 (2d Cir. 2008) (alterations adopted, citations and quotation marks omitted); *see also Grow Universe Inc. v. Doe*, No. 25-CV-1861, 2026 WL 412637, at *2 (S.D.N.Y. Feb. 13, 2026) ("Although *Sealed Plaintiff* addressed a plaintiff's request for anonymity, courts have applied the same factors when a defendant seeks to litigate under a pseudonym."). "Judges in this District regularly permit defendants to proceed anonymously in cases where" the allegations are "highly embarrassing and potentially sensitive and personal," there is a "risk of misidentification where a defendant is only identified by an IP address," and where "the public's interest is not necessarily furthered by knowledge of the defendant's specific identity." *Malibu Media, LLC v. Doe*, No. 15-CV-2624, 2015 WL 6116620, at *5 (S.D.N.Y. Oct. 16, 2012) (collecting cases) (citations and quotation marks omitted).

Allowing Doe to proceed anonymously in *this* matter, however, would do little for Doe's privacy interests, because these proceedings concern a prelitigation subpoena—that is, they are separate from any case for copyright infringement that Petitioner may later bring. A protective order, however, could preserve Doe's anonymity in a subsequent infringement claim, because protective orders can apply to cases other than the ones in which they are issued. *See Loma Deli Grocery Corp. v. United States*, No. 20-CV-7236, 2021 WL 242685, at *2 (S.D.N.Y. Jan. 25, 2021) (approving a protective order that "shall remain in force even after the termination of this case"); *Al-Zarnouqi v. Obama*, 964 F. Supp. 2d 1, 2 n.1 (D.D.C. 2013) (noting an example of a protective order that survived the case in which it was entered). Courts "may, for good cause, issue an order to protect a party from annoyance, embarrassment, oppression, or undue burden" by "forbidding . . . disclosure" of information. Fed. R. Civ. P. 26(c). Protective orders may be issued to prevent the disclosure of an anonymous party's identity. *See, e.g.*, *Digital Sin, Inc. v.*

*Does 1-176*, 279 F.R.D. 239, 242–43 (S.D.N.Y. 2012) (issuing a protective order for defendants' identities in copyright infringement case); *see also Strike 3 Holdings, LLC v. Doe*, No. 25-CV-6294, 2025 WL 2237479, at *3 (W.D.N.Y. Aug. 6, 2025) (same); *Montague v. Poly Prep Country Day Sch.*, No. 21-CV-4054, 2025 WL 1075063, at *9–10 (E.D.N.Y. Apr. 10, 2025) (granting protective order "provid[ing] . . . that [the p]laintiff . . . will proceed under a pseudonym in this lawsuit and his name will be redacted or otherwise stricken from publicly filed documents").

Accordingly, counsel for Doe and Petitioner shall confer within 14 days in an effort to agree on the language of a protective order protecting Doe's identity from public disclosure.  If Doe and Petitioner are unable to agree, Doe shall file a letter no later than 7 days from the conference indicating Doe's position on whether a protective order is appropriate and what form it should take, addressing the *Sealed Plaintiff* factors.  Petitioner shall respond to that letter in no later than 7 days.

### III.  Conclusion

For the foregoing reasons, Doe's Motion is denied.  The Clerk of Court is respectfully directed to terminate the pending motions (Dkt. Nos. 28, 38).  Cloudflare's compliance with the subpoena, (*see* Dkt. (minute entry dated Feb. 23, 2026)), shall remain held in abeyance until the Court addresses whether a protective order should be entered.

SO ORDERED.

Dated:    July 21, 2026
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge

27